

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-2006

# USA v. Mosley

Precedential or Non-Precedential: Precedential

Docket No. 05-1519

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Mosley" (2006). *2006 Decisions*. Paper 649.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/649

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1519

———

UNITED STATES OF AMERICA

v.

ROBERT MOSLEY,

Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cr-00190)
District Judge:  Honorable John R. Padova

———

Argued June 15, 2006
Before:  FISHER, CHAGARES and
REAVLEY,[*] *Circuit Judges*.

(Filed: July 21, 2006)

———

[*]The  Honorable  Thomas  M.  Reavley,  United  States
Circuit Judge for the Fifth Circuit, sitting by designation.

David L. McColgin
Brett G. Sweitzer (Argued)
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Attorneys for Appellant*

Jennifer A. Williams (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        *Attorney for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

We are presented here with a casebook-ready fact pattern implicating an area of Fourth Amendment law that has long been a source of confusion. Today we explain, as clearly as we can, how the exclusionary rule applies in cases in which evidence obtained during an illegal traffic stop is introduced against a passenger with no possessory interest in the vehicle.

We hold that when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the

government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged. The metaphorical bubble of causation encapsulates the entire vehicle and links the illegality of the stop to the Fourth Amendment rights of all of the occupants.

In so holding, we join all of our sister circuits that have directly faced this issue. We will canvass that caselaw, and explain why we agree with it.

## I.

On the night of October 28, 2003, Robert Mosley went to the Diamond Dolls nightclub in Philadelphia with his nephew Jerome Small, who drove. While they were at the club, Small received a telephone call from a romantic acquaintance, and told Mosley that he was leaving the club to go meet her. Not wanting to leave Mosley without a ride home, Small introduced Mosley to his friend Julian Hayes, who agreed to drop Mosley off on his way home. At around 1:30 a.m., Mosley left the club with Hayes and Erica Scott, a dancer at the club who was accompanying Hayes. Hayes and Scott got in the front seat of Hayes' vehicle, a green Suzuki SUV, and Mosley got in the back.

At about the same time, a police radio call went out advising officers to be on the lookout for a black man with dreadlocks driving a green SUV. The source of the information relayed in the radio call is not reflected in the record. Police officers on patrol in the neighborhood of the nightclub heard the call and shortly thereafter saw Hayes' SUV, a green SUV with

3

a black driver, as it was pulling away from the nightclub. They immediately pulled the car over. Upon approaching the car, the responding officers observed a gun on the floor under the driver's seat. They then ordered Hayes, Scott, and Mosley to get out of the car, and searched it, recovering a second gun from the front seat, two from the floorboards of the back seat area, and one from the back seat itself. Hayes and Mosley were arrested and charged with gun possession.

However, the Supreme Court has held that anonymous tips do not provide sufficient justification for an investigatory stop, *see Florida v. J.L.*, 529 U.S. 266 (2000), and the officers did not observe Hayes committing any traffic violation that would have justified the stop under *Whren v. United States*, 517 U.S. 806 (1996). The government conceded that the stop was illegal, and dropped all charges against Hayes.

The government proceeded, however, with the gun possession case against Mosley, arguing that because he was a passenger in the vehicle, he could not seek to suppress the guns, notwithstanding the illegality of the stop. Mosley contended that insofar as he had been illegally seized by the traffic stop, he should have the same suppression claim as Hayes. The District Court agreed with the government, and admitted into evidence the guns found in the back seat of the vehicle.[1] Mosley was convicted under 18 U.S.C. § 922(g) for possessing a firearm

---

[1]The jury specially found that Mosley had possessed only the gun that was on the seat itself, and not the two that were on the floor.

4

following a felony conviction.[2] He appeals on several grounds; we will decide the case on the suppression issue.[3] "We review the denial of a motion to suppress for clear error as to the underlying factual determinations and exercise plenary review over the application of the law to those facts." *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005).

---

[2]Mosley had a prior felony conviction for burglary, which supplied the predicate for the § 922(g) charge.

[3]Mosley also contends, first, that the evidence of constructive possession was insufficient; second, that the District Court erroneously sentenced him under the "armed career criminal" enhancement provisions of 18 U.S.C. § 924(e); third, that the District Court failed adequately to determine whether Mosley's prior convictions were "related" for purposes of calculating his criminal history under the Guidelines; and fourth, that § 924(g), the felon-in-possession statute, is unconstitutional under the Commerce Clause. As to these, the government concedes error on the § 924(e) issue, and does not object to reconsideration of the Guidelines criminal history calculation. Because we will order suppression of the guns, we deem it unnecessary to decide the sufficiency question. And we acknowledge that the Federal Public Defender's office preserves the Commerce Clause challenge to § 922(g) in order to pursue certiorari in the Supreme Court; we are bound by our prior case, *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), in which we upheld the constitutionality of the statute.

## II.

When one peruses the traffic-stop suppression caselaw, one is struck by how rarely a traffic stop is found to have been illegal. In *United States v. Whren*, 517 U.S. 806 (1996), the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime. And once a car has been legally stopped, the police may "escalate" the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."). Courts give considerable deference to police officers' determinations of reasonable suspicion, *see*, *e.g.*, *United States v. Nelson* 284 F.3d 472, 482 (3d Cir. 2002), and the cases are steadily increasing the constitutional latitude of the police to pull over vehicles.[4]

---

[4]Consider this scenario: the police mount an operation in which they erect a fake "drug checkpoint" (which are flatly illegal under *Indianapolis v. Edmond*, 531 U.S. 32 (2000)) and then stake out the highway exit just before the fake checkpoint, videotape all vehicles exiting there, and pull over any vehicle that violates a traffic law (for example, failing to signal at the exit turn). The practice was upheld this year in *United States v. Rodriguez-Lopez*, 444 F.3d 1020 (8th Cir. 2006). More

6

Passengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding. Because the Fourth Amendment's protection against unreasonable searches is predicated on the invasion by the government of a person's reasonable expectation of privacy, passengers are generally held to lack "standing"[5] to object to evidence discovered in a search of a vehicle. *See Rakas v. Illinois*, 439 U.S. 128 (1978). Fourth Amendment rights are personal rights, and a search of a car does not

famously, in *United States v. Arvizu*, 534 U.S. 266 (2002), the Supreme Court reversed the Ninth Circuit's determination that a Border Patrol officer had gone too far in basing a traffic stop of a family van on his observation that the kids had waved at him "mechanically."

[5]The "standing" inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated. *See United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994) ("We use the term 'standing' as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action. 'Technically, the concept of "standing" has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law.' *United States v. Sanchez*, 943 F.2d 110, 113 n.1 (1st Cir. 1991).").

implicate the rights of non-owner passengers: the car is treated conceptually like a large piece of clothing worn by the driver.

But we should not be distracted by the fact that this case involves evidence found in a car. This is not an "auto search" case. The search of the car is not before us; the seizure of Mosley is. This case is about an illegal seizure by the police of the defendant, pursuant to which evidence was discovered. The violation of Mosley's Fourth Amendment rights was the traffic stop itself, and it is settled law that a traffic stop is a seizure of everyone in the stopped vehicle, *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979).[6] Thus passengers in an illegally stopped

---

[6]While the District Court's opinion is not entirely clear on this point, we read it to suggest that the District Court analytically separated the detention of the vehicle from the removal and detention of Mosley's person, and believed that only the latter constituted a seizure of Mosley for Fourth Amendment purposes. The District Court stated, for example, that "[f]or purposes of the instant Motion [to suppress], the Government concedes that the officers violated Defendant's Fourth Amendment rights by removing him from the vehicle and detaining him in connection with the stop of the vehicle."

The Fourth Amendment violation, however, was the traffic stop itself, and not just Mosley's removal from the car. We wish to reiterate this point for the benefit of future litigants: a Fourth Amendment seizure of every occupant of a vehicle occurs the moment that vehicle is pulled over by the police. The legality of the seizure depends upon the legality of the traffic stop.

vehicle have "standing" to object to the stop,[7] and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine, as expounded in the line of cases following *Wong Sun v. United States*, 371 U.S. 471 (1963). The dispositive legal issue is the causal relationship between the traffic stop and the discovery of the evidence: whether the evidence found in the car was "fruit" of the illegal stop. The question that bedeviled the proceedings below is whether the evidence found in the car was causally linked to the illegal seizure of Mosley, the passenger.

In analyzing that causal connection, the District Court relied on a Tenth Circuit case, *United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001), in which a passenger sought to suppress evidence found during a traffic stop. Taking its cue from that case, the District Court proposed various hypotheticals to test the "factual nexus" between the violation of Mosley's Fourth Amendment rights and the discovery of the evidence. Specifically, the District Court pondered whether, if Mosley had asked for and received permission to leave the scene immediately after the car was stopped, the evidence in the car would still have been discovered. Since the answer to that

---

[7]For the most comprehensive collection of cases, see 6 Wayne R. LaFave, *Search and Seizure* § 11.3 (4th ed. 2004) (citing, inter alia, *United States v. Grant*, 349 F.3d 192 (5th Cir. 2003); *United States v. Ameling*, 328 F.3d 443 (8th Cir. 2003); *United States v. Gama-Bastidas*, 142 F.3d 1233 (10th Cir. 1998); *United States v. Sowers*, 136 F.3d 24 (1st Cir. 1998); *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992)).

9

question is obviously "yes," the District Court ruled that Mosley had failed to demonstrate an adequate "factual nexus" between the illegal government action and the discovery of the challenged evidence. Although the government had clearly violated Mosley's Fourth Amendment rights, the District Court determined that the specific violation of Mosley's rights – as opposed to Hayes' rights – did not have a sufficiently close causal connection, or "factual nexus," to the discovery of the evidence to support Mosley's suppression claim.

The general requirement of a "factual nexus" between a specific Fourth Amendment violation and a specific piece of evidence derives from two Supreme Court cases on wiretap evidence. In those cases, the government had gathered thousands of discrete pieces of evidence over many months of investigation. Over the course of the investigation, the government committed various illegal acts, and the question for the Court was how to determine which pieces of evidence were tainted by the particular illegal actions. *See United States v. Nardone*, 308 U.S. 338, 341 (1939); *United States v. Alderman*, 394 U.S. 165, 183 (1969). Because of the multiplicity and complexity of the investigation and the evidence, there was no commonsense causal relationship between any given Fourth Amendment violation and any given piece of evidence. Rather than hold all the evidence to have been tainted by the violations, the Court held that the proper course is for district courts to probe more deeply, and employ thought experiments to determine which violation was causally connected to which

10

piece of evidence.[8]   These cases express the commonsense proposition that a single Fourth Amendment violation does not taint an entire case, but only the evidence uncovered as a result of that violation.

Prior to *DeLuca*, courts had not generally thought that traffic stops presented sufficiently complex investigatory contexts to warrant such an added layer of causal analysis.  In *DeLuca*, however, a panel of the Tenth Circuit, over a heated dissent by former Chief Judge Seymour, applied that counterfactual – "What if?" – approach to a suppression motion brought by a passenger who was illegally detained during a traffic stop.  The application of "factual nexus" hypotheticals to a traffic stop suppression case was a novel idea.  The majority view in the circuits was and remains that in a traffic stop, there will always be a sufficient "nexus" between the stop and the search, unless there are significant intervening events that sever or attenuate the causal chain.  There is generally no "nexus" problem in illegal traffic stop cases, as the leading treatise puts it, because the connection between the illegal action and the discovery of the evidence is straightforward:  If the police had not pulled over the vehicle, they would not have discovered the evidence.  *See* 6 Wayne R. LaFave, *Search and Seizure* § 11.4(d) (4th ed. 2004) (summarizing caselaw).

---

[8]The test has since been applied by the Ninth Circuit in complex cases involving ongoing police investigations.  *See*, *e.g.*, *United States v. Kandik*, 633 F.2d 1334 (9th Cir. 1980); *United States v. Allard*, 600 F.2d 1301 (9th Cir. 1979); *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1977).

We can understand why the *DeLuca* majority thought that the case required some revision to the traditional fruits analytical apparatus. *DeLuca* did not involve an illegal traffic stop. It involved instead a legal traffic stop that became illegal when the police continued to detain the vehicle and its occupants after the legitimate purposes of the stop had been completed.[9] Because the stop itself was legal, the court reasoned that whatever government actions violated the defendant's rights must be analytically separable from the traffic stop. The Fourth Amendment violation in *DeLuca* was the detention of the defendant passenger, along with the other occupants of the car, beyond the period necessary to complete the legitimate purposes of the stop. But at the point that the detention of the defendant passenger became illegal, the police already had control over the vehicle. The court therefore tried to tease out the causal efficacy of the precise illegality raised by the defendant passenger. The court asked whether, if the passenger had been allowed to leave the scene before the detention became illegal, the incriminating

---

[9]In fact this is not such an unusual occurrence. A traffic stop requires only reasonable suspicion to believe that a traffic violation has been committed. But detaining the vehicle longer than is necessary to effectuate the legitimate response to that traffic violation requires independent suspicion that some other crime is afoot. The transition from traffic stop to investigatory stop is the focal point of many suppression cases. *See*, *e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (U.S. 2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

evidence would still have been discovered. The answer was "yes": it wasn't his car, so his leaving would not have removed the evidence.

The question in *DeLuca* was thus whether the police would still have discovered the challenged evidence if they had let the passenger go before doing anything illegal to him. On the *DeLuca* facts, if the police had let the passenger go after the initial legal stop but before the subsequent illegal prolongation of the stop, then nothing illegal would have been done to him – and the evidence would still have been discovered. Therefore the passenger had no suppression claim. So reasoned the Tenth Circuit.[10]

But we agree with Mosley that *DeLuca* is inapposite here. The hypothetical, and the holding, are relevant only to situations in which the initial traffic stop is legal, and that is not our case. We express no opinion on the viability in this Circuit of the *DeLuca* test on *DeLuca* facts; we decide the case before us, not

---

[10]Even on its limited facts, *DeLuca* was not uncontroversial. Former Chief Judge Seymour issued a blistering dissent, calling the majority's reasoning "ludicrous," and Professor LaFave concurred in that assessment. The most serious criticism is that the counterfactual methodology "forces the defendant to disprove inevitable discovery and does an end run around the government's burden of proof on inevitable discovery." *DeLuca*, at 269 F.3d at 1145 n.1 (Seymour, J., dissenting).

13

a different one.[11]  But whatever its viability on appropriate facts, this case does not present such facts.  If the initial traffic stop is illegal, then even if the passenger is allowed to leave the scene before the search, it will not be the case that the police have not violated his Fourth Amendment rights.  Where the traffic stop itself is illegal, it is simply impossible for the police to obtain the challenged evidence without violating the passenger's Fourth Amendment rights.  *DeLuca* says nothing about such situations.

The Tenth Circuit itself has addressed the question whether *DeLuca* applies to traffic stops illegal from their inception, and stated clearly that it does not.  It applies, the court explained in a recent suppression case applying *DeLuca*, only to cases in which the illegal police conduct occurred after the

---

[11]We will not be overly coy, though: we recognize that the rationale for our holding might be thought to undermine the *DeLuca* rationale even on *DeLuca* facts.  But the preceding sentence is dicta; when an appropriate case arises, the parties may do what they will with our decision here.

14

police had legally gained control of the vehicle.[12] The temporal sequence of events makes all the difference, said the court:

> [*Wong Sun*] and its progeny, *see*, *e.g.*, *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053-54 (10th Cir. 1994), are readily distinguishable insofar as in those cases the illegal police conduct preceded the means by which the evidence was obtained, thus establishing the requisite factual nexus between the evidence and the illegal conduct. By contrast, any unlawful police activity here occurred after voluntary consent had been obtained. Consequently, [the defendant] could not establish that, but for the alleged illegal seizure, the evidence would not have come to light as required by *DeLuca*.

---

[12]And the same is true of an earlier Tenth Circuit case, *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000), cited in *DeLuca*: "Nava-Ramirez does not contest the legality of the initial stop. Rather, he argues that at the moment [the officer] concluded his search of the passenger compartment without finding any evidence indicating Nava-Ramirez was involved in illegal activity, his continued detention became unlawful." That factual setting – initially legal stop, subsequent illegal detention of passenger – is the underpinning and necessary condition for the *DeLuca*-type "factual nexus" test. It has absolutely no application to situations where the passenger challenges the legality of the initial stop.

15

*United States v. Roberts*, 91 Fed. Appx. 645, 648 (10th Cir. 2004) (emphasis added).

The District Court's application of *DeLuca* to the case at bar, in which the illegal police conduct preceded the means by which the evidence was obtained, was error, because even under the Tenth Circuit's heightened "factual nexus" test, such a temporal scenario would appear to clearly supply the requisite "factual nexus."[13]

It is clear, so far, that an illegal traffic stop constitutes a seizure of all occupants of a vehicle, including passengers, and that whatever the utility of the *DeLuca* counterfactual analysis to fact patterns not before us, it is not the proper analytical model for the case that is before us.

---

[13]The *Roberts* case, to be sure, is unpublished, but we think the recently adopted amendment to Fed. R. App. Proc. 32(a) confirms the utility of looking to unpublished cases to determine how precedential cases are applied. Where, as here, an NPO clarifies the application of a prior precedent, almost all the circuits allow its citation by the parties, and we will not needlessly deprive ourselves of useful guidance on the scope of the caselaw that governed this case below.

## III.

### A.

Fourth Amendment rights are personal rights. That proposition is not in dispute. The problem is that from that proposition, the result in any particular case is not always immediately obvious. Mosley does not dispute that he had no personal expectation of privacy in the interior of the car; the government does not dispute that he did have a reasonable expectation that he would not be seized without probable cause. The problem is whether the evidence in this case was discovered as a result of his seizure.

As we will detail below, most courts treat evidence found during an illegal traffic stop as the fruits of that stop, and see no conceptual difficulties in suppressing such evidence when introduced against passengers. Our most recent decision to face such a scenario, *United States v. Williams*, 413 F.3d 347 (3d Cir. 2005), concerned a non-owner passenger in a parked van that was approached by two police officers, who subsequently observed contraband in the vehicle. The defendant claimed that the approach constituted a seizure. We framed the suppression issue as follows:

> The central issue on appeal . . . is whether Williams was seized within the meaning of the Fourth Amendment when the police . . . approached the van. If Williams was "seized" by the police when they approached the parked van without probable cause or reasonable suspicion to

17

> do so, then the District Court correctly suppressed all evidence obtained in connection with the ensuing arrest under the "fruits of the poisonous tree" doctrine.

413 F.3d at 351. Our approach can be summarized as follows: We ask, first, whether there was a seizure. If so, then we ask whether there was reasonable suspicion or probable cause. If not, then suppression is proper unless the government can show that the taint was purged. We did not even comment in *Williams* on the "causal nexus" between the alleged seizure and the discovery of evidence; on these facts we took that nexus to be self-evident.

However, the quoted passage is dicta because we held both that the approach was not a seizure and that the officers had reasonable suspicion sufficient for a *Terry* stop in any event. The vehicle was parked in a public place and the officers did not make a show of force, and "law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places." *Id.* at 352 (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)).

Though dicta, the analytical approach suggested by *Williams* is consistent with the approach proposed by the leading Fourth Amendment treatise.

> In the typical case in which an illegal arrest is followed by a search no "fruits" problem of any magnitude is presented. . . . This is direct rather

18

than derivative evidence, and there is no occasion to be concerned about the limits of the fruit of the poisonous tree doctrine. . . . Problems of this kind arise in the context of passengers in vehicles attempting to have evidence found therein suppressed . . . . [T]he passenger will claim that the subsequent discovery of the evidence in the vehicle was a fruit of his prior illegal detention. *It is very often the case that such a connection is readily made out when the initial stopping of the vehicle (and thus all of the occupants) was illegal.*

6 LaFave, *supra*, § 11.4(d) (emphasis added).

We have not, however, yet had occasion to decide a case requiring a precise articulation of the application of the fruit of the poisonous tree doctrine to evidence found during illegal traffic stops when introduced against vehicle passengers. We will therefore state the theoretical issue as perspicuously as we can: Is an illegal traffic stop of a car occupied by a driver and a passenger a single constitutional violation, with two victims, each of whom can seek to suppress all fruits of that violation? Or is it analytically separable into two individual constitutional violations, each with one victim, each of whom may seek to suppress only the fruits of the violation of his individual right? Today we endorse the former proposition, but as we acknowledge the logical appeal of the latter proposition, we will set out the best arguments in its favor, and then explain why we are rejecting them.

**1.**

The "analytic separation" position, the position we are rejecting, can be defended both on logical grounds and via a reductio ad absurdum. Here are the logical grounds. Because Fourth Amendment rights are personal rights, when the police pull over a car with a driver and a non-owner passenger, two individual seizures occur simultaneously: seizure of the driver, and seizure of the passenger.[14] Thus, we should not see the traffic stop as one discrete constitutional violation (with two victims), but rather as two separate constitutional violations (each with one victim). Because fruits analysis always proceeds from the specific constitutional violation inflicted on the defendant, this analytic separation of violations necessitates a concomitant separation of the respective fruits suppression analyses. Because the violation of the passenger's constitutional rights was the seizure of the passenger (analytically separated from the seizure of the driver), we must ask, in any fruits analysis, whether the challenged evidence was seized as a causal result of the seizure of the passenger. To get at the interior of the car, where the evidence is located, the police must perforce seize the driver and the passenger, by stopping the car. But that one act constitutes two separate seizures. The passenger was not in control of the car, so it is the seizure of the driver, and not the passenger, that is required in order for the police to obtain control over the car. The passenger's presence has no effect on

---

[14]Actually three seizures occur, because the car itself is also seized. But only the personal seizures are relevant to the argument.

20

the ability of the police to seize the driver and control the car. Thus the evidence in the car would be found whether or not the passenger was present in the car at all. Seizure of the passenger is, accordingly, logically ancillary to the search of the vehicle. It is logically necessary only for a search of the passenger's person. On this view, therefore, evidence found in the car, but not on the passenger's person, cannot be suppressed by the passenger, even though the seizure of the passenger was unconstitutional.

Some simple hypotheticals bring out the force of this argument. Suppose that the car stops and X, a passenger, gets out at the corner. Just as the car begins to pull away, the police, acting on an anonymous tip, roar up and stop the car, simultaneously ordering X, on the sidewalk, to freeze. Evidence is found in the car but is suppressed as to the driver because the stop was illegal. It is then introduced against X. May X suppress? Certainly not. The two seizures are clearly separate causal events for Fourth Amendment purposes. Nor can X challenge a search of the car, no matter how illegal, because he has no privacy interest in the car.

Now put X back in the car. What is the legal significance of that change of place? The most obvious difference is that it becomes physically impossible for the police to stop the car (and detain the driver) without also seizing and detaining X. But X's legal situation with respect to the car and driver remains the same: as a passenger, his privacy interest in the interior of the car is precisely what it was when he was standing on the sidewalk – zero. Thus, just as X's seizure on the sidewalk cannot logically or legally have been a cause of the discovery of

evidence inside the car, neither can his seizure while inside the car as a passenger be a logical or legal cause of the discovery of evidence inside the car.

The discovery of evidence inside a car simply cannot be a violation of a passenger's Fourth Amendment rights, according to this argument. The passenger has a personal right not to be seized, and that right is violated when the car is illegally pulled over. But the illegal seizure of the passenger's person cannot be a legal cause of the discovery of evidence that is not on the passenger's person. The police may have performed both acts at the same time, but because there was no logical connection between the two the illegal seizure was not a but-for cause of the discovery of the evidence.

**2.**

Here is the reductio ad absurdum. It is settled law that if the police illegally enter a house and search it, the owner or tenant of the house, or any long-term guests, may suppress evidence found during the search.[15] Short-term guests, however, have no expectation of privacy in the house and therefore cannot suppress the fruits of the illegal search. This is true even if the short-term guests were seized pursuant to the illegal entry into the house. If, for example, the police barricaded the exits to a

---

[15]Unless, of course, the illegality is restricted to a violation of the knock-and-announce rule, in which case no one, not even the owner, can suppress. *See Hudson v. Michigan*, 547 U.S. --- (2006).

residence, entered, and ordered everyone present to freeze, they would have thereby seized everyone present in the residence. If their entry was illegal, for example if effected without a warrant and absent exigent circumstances, then all of those seizures were illegal. However, only the owner, tenant, or long-term guests could suppress evidence found during the search. Short-term guests would face the full evidentiary weight of any evidence discovered. *See Minnesota v. Olson*, 495 U.S. 91 (1990).

Now make the house a mobile home, and drive it down the street until it is pulled over illegally. The police again illegally seize all the occupants and search the interior. Under the holding we are announcing today – which conforms, as we observed above, with those of our sister circuits – those short-term guests are now passengers in an illegally seized vehicle, and thus can suppress all evidence discovered during the search. This result appears anomalous insofar as the Fourth Amendment has been repeatedly characterized by the Supreme Court as affording enhanced protection to the home, and diminished protection to vehicles. *Compare*, *e.g.*, *Georgia v. Randolph*, 547 U.S. --- (2006), slip op. at 10 (citing *Wilson v. Layne*, 526 U. S. 603, 610 (1999) (invoking the "centuries-old principle of respect for the privacy of the home"); *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people."); *Miller v. United States*, 357 U.S. 301, 307 (1958) (noting common law tradition that a poor man in a humble cottage might nonetheless bid defiance to all the forces of the crown (if it is his cottage)), *with*, *e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (explaining that Fourth Amendment protections are lessened for occupants of

23

cars because cars searches do not implicate "the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection."). Yet in our hypothetical, passengers in a vehicle are afforded greater Fourth Amendment protection than guests in a home.

## B.

We have set out a coherent logical argument for an analytic separation rule, and highlighted an apparently anomalous contrast between vehicle and home seizure cases that rejection of that rule might seem to entail. But we are not persuaded. We will respond to the argument in two ways. First, in Part III.B, we will survey the caselaw of our sister circuits, all of which uphold passenger suppression claims following illegal stops. Second, in Part III.C, we will reject the apparent logical plausibility of the analytic separation argument as inconsistent with the more pragmatic methodology exemplified by the Supreme Court's exclusionary rule jurisprudence.

## 1.

The Ninth and Eleventh Circuits have recently decided cases with precisely analogous facts. *See United States v. Twilley*, 222 F.3d 1092 (9th Cir. 2000); *United States v. Chanthasouxat*, 342 F.3d 1271 (11th Cir. 2003). In each case, the traffic stop was illegal from its inception,[16] and evidence

---

[16]The illegality of the traffic stop was caused in each case by a mistake of law on the part of the police officer. (Unlike a

24

found during the traffic stop was introduced against a passenger in the car. In each case, the government contested the passenger's motion to suppress by arguing that the passenger lacked "standing" to challenge the evidence because he did not have a reasonable expectation of privacy in the interior of the car. In each case, the court applied a standard fruits analysis, and suppressed the evidence as the fruit of the illegal seizure.[17]

The two courts treated this fact pattern as an utterly straightforward and unremarkable application of the fruit of the poisonous tree doctrine. Their analyses proceed precisely as Mosley argues ours should, in the following three steps. First, the traffic stop was a violation of the defendant's Fourth

_____

reasonable mistake of fact, a mistake of law negates reasonable suspicion and renders the stop illegal.) In *Twilley*, the officer pulled over the car based on the California law that all vehicles must display all plates issued by the state of registration. The car was from Michigan, which issues only one plate. The officer assumed that Michigan must issue two because, he said, "an awful lot of states issue two plates." 222 F.3d at 1094. In *Chanthasouxat*, the officer pulled over the van because it lacked an inside rearview mirror, and he thought that Alabama law required one. It does not.

[17]Indeed, both courts made the distinction between the seizure of the passenger effected by the stop, and the subsequent search of the car, noting that were the search the only grounds for suppression, the passenger would lack "standing." *Chanthasouxat*, 342 F.3d at 1273 n.1; *Twilley*, 222 F.3d at 1095.

Amendment rights; second, the evidence was found as a direct consequence of the stop (that is, there were no significant intervening events); third, the government did not establish any of the various available exceptions (attenuation, independent source, inevitable discovery). The *Twilley* court held that "[b]ecause we conclude that the stop was not supported by reasonable suspicion, and because the subsequent search was a product of the stop, the evidence leading to Twilley's conviction should have been suppressed." *Id.* at 1097.[18] The *Chanthasouxat* court held that "[b]ecause we conclude that the initial traffic stop violated the Fourth Amendment, the violation was not cured by voluntary consent, and that Chanthasouxat's [incriminating] statements [made during the stop] were fruits of the poisonous tree, we hold that the drug evidence and Chanthasouxat's statements must be suppressed." 342 F.3d at 1281.

---

[18]The parties give a fair amount of attention to *United States v. Pulliam*, 405 F.3d 782 (9th Cir. 2005), but *Pulliam* is inapposite for the same reason most of the apparently analogous cases are: there was no determination or allegation that the initial stop of the car was illegal. The defendant in *Pulliam* was convicted based on evidence found in a search of a car in which he was a passenger, but he challenged only his personal arrest and search – not the initial traffic stop. He conceded that the traffic stop was legally justified, because the car had a broken tail light. 405 F. 3d at 785. *Pulliam* is just another of the many cases where passengers lose suppression motions following legal traffic stops. That is not our case.

What is noteworthy about these cases is that they include no discussion whatsoever of the "factual nexus" between the illegal stop and the discovery of the evidence. The courts see the chain of events between the illegal stop and the subsequent discovery of evidence to constitute such a self-evidently close "factual nexus" that, as Professor LaFave puts it, *see* 6 LaFave, *supra*, § 11.4(d), there is no need to probe the limits of the fruit of the poisonous tree doctrine.[19]

---

[19]*See also*, *e.g.*, *United States v. Colin*, 314 F.3d 439 (9th Cir. 2002) (same analysis as *Twilley*, and collecting cases). In both *Twilley* and *Chanthasouxat*, indeed, (and unlike our case) the driver of the vehicle in fact consented to the search, but the court ruled that the consent was not "obtained by means sufficiently distinguishable from the illegal stop to be purged of the primary taint." *Chanthasouxat*, 342 F.3d at 1280 (internal quotes, brackets omitted); *accord Twilley*, 222 F.3d at 1097 (because "the interrogation and search were a direct result of the illegal stop . . . this is a classic case of obtaining evidence through the exploitation of an illegal stop.") (internal quotes omitted).

Consent following an illegal seizure does not in itself purge the taint of the illegality for Fourth Amendment purposes; the government must show sufficient attenuation to causally disconnect the consent from the seizure. *See United States v. Snype*, 441 F.3d 119, 133 (2d Cir. 2006) (collecting numerous cases).

**2.**

In *United States v. Reed*, 349 F.3d 457 (7th Cir. 2003), the defendant passenger confessed to drug distribution after spending several hours with police (whether in custody or not was disputed) following a traffic stop. He contended that the police lacked probable cause for the stop,[20] and sought suppression of the confession on fruits grounds. The district court ruled that even if the arrest was illegal, his subsequent confession was still voluntary. Thus the district court did not rule on the legality of the initial stop. On appeal, the Seventh Circuit, applying *Brown v. Illinois*, 422 U.S. 590 (1975), vacated and remanded, holding that, notwithstanding the lapse of time and the voluntariness of Reed's confession, the confession would have to be suppressed as fruit of the poisonous tree if the initial stop had been illegal. The *Reed* court explicitly rejected a "counterfactual purgation" analysis of the sort employed by the Tenth Circuit in *DeLuca* and by the District Court in the case at bar:

> The dissent opines that Reed would have confessed even if he had been allowed to go home

---

[20]The police officer pulled over the truck in which Reed was a passenger because it was towing a horse trailer, and, the officer testified, horse trailers are sometimes used to transport marijuana because the smell of the horses masks the smell of the drugs. In fact, the trailer contained horses and cash, but not drugs. In the disputed confession, Reed admitted having been part of a separate distribution conspiracy. 349 F.3d at 462.

rather than being held for hours, because his confession stemmed from a desire to win favor and reward and was not a consequence of the illegality. We cannot make that determination as a matter of law, and the government has the burden to prove that his confession was attributable to a factor other than the prolonged detention following the allegedly illegal arrest. That Reed determined that it was in his best interest to cooperate does not somehow divorce his decision from the unlawful detention.

*Reed*, 349 F.3d at 466.

The *Reed* court rejects both components of the *DeLuca* counterfactual analysis: first, the shifting of the explanatory burden to the defendant, and second, the artificial "divorcing" of the (legal) act by which the evidence was physically obtained from its (illegal) necessary causal antecedent. If that divorce is going to occur, the court insists, it will be through the standard fruits exceptions, and they must be shown by the government.

**3.**

In *United States v. Guevera-Martinez*, 262 F.3d 751 (8th Cir. 2001), the defendant was a passenger in a car pulled over in an illegal traffic stop. During the stop, the officers searched the car and discovered methamphetamine. On that basis they arrested Guevera-Martinez. That night, in jail, he told an INS agent that he was in the country illegally. Guevera-Martinez was charged in separate indictments with both drug and

immigration violations. Guevera moved to suppress the drugs, arguing that the traffic stop was illegal. The district court granted the motion, and the drug charges were dismissed. On the immigration charge, Guervera-Martinez sought to suppress both the statements he made and the fingerprints taken while he was in jail. The district court granted the suppression motion on the same grounds, holding that both the statements and prints were fruit of the illegal traffic stop, and the Eighth Circuit affirmed.

The Eighth Circuit applied a straightforward fruits analysis: "[O]fficers obtained Guevera-Martinez's fingerprints [and statements] by exploiting his unlawful detention, instead of by means sufficient to have purged the taint of the initial illegality." *Id.* at 755. The court deemed it irrelevant that Guevera-Martinez "will inevitably face" civil deportation proceedings in which new fingerprint evidence would easily be obtained, and which would support the reinstatement of the criminal immigration charges: "[T]he government asks us to ignore its use of tainted evidence in this case. We decline to [do so] . . . The important thing is that those administering the criminal law understand that they must obtain the evidence the right way." *Id.* at 756 (quoting *Davis v. Mississippi*, 394 U.S. 721, 726 n.4 (1969) (internal quotes, brackets omitted).

**4.**

*United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), is also very close in its facts to the case at bar. In *Dortch*, the defendant was the driver rather than a passenger, but this difference is irrelevant because Dortch's suppression claim was

30

based solely on the detention itself. Dortch was stopped for a traffic infraction, and he did not challenge the legality of the stop. However, the police continued to detain him (and, obviously, his vehicle) after the legitimate purpose of the traffic stop had been completed. *Id.* at 197. Instead of allowing him to leave, the police detained him for fifteen minutes while they summoned a drug-sniffing dog team.

The bulk of the Fifth Circuit's analysis is devoted to the question of whether Dortch's continued detention, once the purposes of the traffic stop had been completed, was legal. The court concluded that it was not – that the police had no probable cause to continue to detain him. The government argued that Dortch consented to the subsequent search once the dog team arrived, but the court held that even if he did consent, the evidence must still be suppressed: "even if Dortch's consent was voluntarily given . . . the consent was not valid. Instead, because the causal chain between the illegal detention and Dortch's consent . . . was not broken, the search was nonconsensual." *Id.* at 202.

The court thus ordered suppression of all the evidence – which was considerable – that had been amassed against Dortch, and remanded not just for retrial, but with the specific order that he be granted a judgment of acquittal. The justification was straightforward fruits analysis: the moment the legal purposes of the traffic stop were satisfied, any further detention of Dortch was illegal. When the dog team arrived, the dogs were sent around the car and alerted to it. On that basis, the police searched the car and found drugs. And on that basis they

31

secured a warrant for Dortch's home, searched it and found more drugs and paraphernalia.

The *Dortch* case is particularly significant as an analogue to the case at bar because it was governed by the twin propositions that, first, an exterior investigation of a car by a drug-sniffing police dog is not a search as a matter of law, *see Dortch*, 199 F.3d at 198; (citing *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir. 1993)); *see also Illinois v. Caballes*, 543 U.S. 405, 409 (2005), and second, that the dog's alerting to the car constitutes probable cause for a search, as a matter of law. *See Dortch*, 199 F.3d at 198 (citing *United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995). Thus, in Dortch's case, as in Mosley's, there was no search to which he can object. If the dog team had arrived while Dortch was legally detained, there would have been no Fourth Amendment violation.[21] The only basis for

---

[21]And indeed Dortch was neither the owner nor the authorized possessor of the car. The car had been rented by a third party (neither Dortch nor the passenger). Thus there is a colorable argument that Dortch had no reasonable expectation of privacy in the interior of the car whatsoever. But the court explains that it does not need to reach that issue, because the detention was illegal, and the fruits suppression follows directly from that determination. *See Dortch*, 199 F.3d at 197-98 and n.4 ("Given that Dortch does not challenge the legality of the search, it is puzzling that the dissent goes to such efforts to develop its theory that 'because the rental agreement provided only the renter was an authorized driver, Dortch had no right to complain of the vehicle's detention.' In arguing that Dortch has

Dortch's suppression motion, as for Mosley's, is that the challenged evidence is the fruit of an illegal detention. Thus it is irrelevant that Dortch was the driver rather than a passenger, because that distinction applies only to challenges to the search of the car, and Dortch, like Mosley, made no such challenge.

*United States v. Jones*, 234 F.3d 234 (5th Cir. 2000), is similar to *Dortch*. In *Jones*, the car was validly stopped for speeding, but the police continued to detain both driver and passenger without probable cause after the legitimate purposes of the stop – issuance of a citation, and computer criminal history check – were completed. During the illegal prolongation of the detention, the driver consented to a search of the car, and contraband was discovered. The Fifth Circuit, upon determining that the consent was not sufficiently attenuated from the illegal detention to have been purged, ordered suppression of the evidence as to both the driver and the passenger, reasoning that although the passenger had no standing to challenge the search of the car, he could challenge the illegal extension of the traffic stop, and that extension was a single event which was causally connected to the discovery of the evidence. *Id.* at 244.

*Dortch* and *Jones* suggest very strongly that had Mosley's case arisen in the Fifth Circuit, the gun would be suppressed. In *Dortch*, just as here, there was no invasion of the defendant's

no legitimate privacy interest in a rental car, the dissent seems to miss the point. As we explain above, Dortch's complaint is not that the vehicle was detained or improperly searched, but rather that he was improperly seized . . . .").

33

reasonable expectation of privacy in the *search* that produced the evidence. The invasion came solely in the *detention* (seizure of the person), and the court applied a straightforward fruits analysis, pursuant to which it took it as self-evident that a car search following an illegal traffic stop is the fruit of that stop.

**5.**

In *United States v. Kimball*, 25 F.3d 1 (1st Cir. 1994), the defendant was a passenger in a car that was stopped by the police. All three occupants were arrested on suspicion of burglary, and the police performed an "inventory" search of the car upon towing it to the station. Kimball sought to suppress evidence recovered from the car, and the court framed the issue as follows:

> A police officer's act of stopping a vehicle and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment. . . . When a police officer effects an investigatory stop of a vehicle, all occupants of that vehicle are subjected to a seizure, as defined by the Fourth Amendment. The fact that a defendant is a passenger in a vehicle as opposed to the driver is a distinction of no consequence in this context. The interest in freedom of movement and the interest in being free from fear and surprise are personal to all occupants of the vehicle, and an individual's interest is not diminished simply because he is a passenger as opposed to the driver when the stop occurred. . . . Thus, if the initial

34

stop of the vehicle was illegal, evidence seized by virtue of that stop, such as the tools in this instance, may be subject to exclusion under the "fruit of the poisonous tree" doctrine.

*Kimball*, 25 F.3d at 5-6 (citations omitted).

The court then added, in a very significant footnote:

The Government's reliance on *Rakas v. Illinois*, in the context of a stop, is misplaced. In *Rakas*, the United States Supreme Court held that a mere passenger in an automobile ordinarily does not have the legitimate expectation of privacy necessary to challenge the search of that automobile. The Supreme Court's decision, however, was limited to the issue of whether the passenger's legitimate expectation of privacy was invaded by a search of the vehicle, *and not the stop thereof.*

*Id.* at 6 n.3 (emphasis added, internal cites omitted).

The footnote is significant because it helps to clarify what we think was a source of confusion in the proceedings below. *Rakas* held simply that a passenger in a car has no reasonable expectation of privacy in the interior of the car, and thus that a search of that car does not violate any of the passenger's Fourth Amendment rights. But *Rakas* says absolutely nothing about the scope of the exclusionary rule with respect to the fruits of an illegal stop. The *Kimball* court makes it clear that the

35

passenger's reasonable expectation of privacy vis-a-vis the search is completely irrelevant to the fruits inquiry with respect to the stop.

We read *Kimball* as holding that the determinative question in passenger suppression is the legality of the stop: if the stop is illegal, then standard fruits suppression will apply.[22]

---

[22]The court ultimately affirmed the denial of Kimball's suppression motion on the grounds that the stop was reasonable. 25 F.3d at 8.

For an illustration of this methodology in practice in the district courts, see *United States v. Jones*, 374 F. Supp. 2d 143 (D.D.C. 2005), which is very strongly analogous to our facts. The district court suppressed all the challenged evidence against the defendant after going through precisely the fruits analysis Mosley contends for here. Jones was a non-owner passenger in a vehicle that was illegally detained by the police. The car was parked when officers approached, questioned, detained, and arrested the two occupants, effecting an illegal seizure of Jones. The government argued first that the encounter was consensual, and then in the alternative that it was a permissible *Terry* stop. The court rejected both arguments and found the detention to be illegal. *Id.* at 149, 152. Accordingly, it suppressed all evidence subsequently recovered, including both physical evidence and statements, because "the government failed to meet its burden of justifying under the Fourth Amendment the police intrusion upon Jones' liberty." *Id.* at 153. The court recognized that Jones, as a non-owner passenger, "failed to demonstrate a legitimate expectation of privacy in the vehicle or items

36

**6.**

The government brings to our attention *United States v. Carter*, 14 F.3d 1150 (6th Cir. 1994), a case in which evidence found during a search of a vehicle was suppressed as to the driver but admitted as to the passenger. Carter was a passenger in a van, which the police pulled over for failure to have a valid license plate. The crucial factual and procedural point, which makes *Carter* inapposite, is that Carter did not challenge the legality of the initial stop. Thus *Carter*, like *DeLuca*, cannot guide the analysis in our case, because unlike in our case, the court did not find that the initial traffic stop itself was illegal:

> [W]hether or not the original traffic stop was
> unconstitutional – an issue that was not preserved
> in Carter's objection to the magistrate's report and
> that we do not reach here – we shall assume for

recovered from it," *id.* at 154, but deemed that fact irrelevant because the suppression claim was grounded in the illegal detention rather than the search itself. "[The auto passenger search cases] involve claims that the search of the vehicle or compartments within it was unlawful. By contrast, Jones here argues that he was unlawfully stopped and seized, and thus the contents of the [car] should be suppressed as the result of that unlawful seizure." *Id.* The court accordingly considered whether any "dissipating" or "purging" factors were present, such as lapse of time or intervening circumstances. Finding none, the court ordered all evidence recovered as a result of the initial encounter to be suppressed.

purposes of analysis, not only that the subsequent arrest of the driver was unconstitutional, but also that the detention of Mr. Carter, if not illegal from the outset, became illegal when the driver was arrested.

*Carter*, 14 F.3d at 1154.

Note that the court does not hold that Carter's suppression motion would fail even if the initial traffic stop had been illegal. The court does not assume that the initial stop was illegal, but only that Carter's detention "became illegal when the driver was arrested." That distinction (carefully preserved by the "if not" construction) makes all the difference. As long as the police initially obtained control over the vehicle legally, then (on the *DeLuca* reasoning) no search of the vehicle *after* that point, no matter how unconstitutional, will be subject to challenge by a passenger. But *Carter* does not address the situation in which the initial stop was illegal; to so treat it is to stretch its holding not only beyond its facts but beyond its language.

## C.

As the preceding survey establishes, the prevailing rule in the courts of appeals is that an illegal traffic stop entails a suppression remedy for all occupants of the car. The authority of our sister circuits is persuasive. However, we think the interests of justice and jurisprudential clarity are best served by giving this issue the fullest possible airing, so we think it incumbent on us to rebut the logical argument for analytic

38

separation we presented above. We think that argument is rebuttable independently of the persuasive weight of our sister circuits' decisions, for the following reasons.

First, we do not think it quite so self-evident that the seizure of a passenger in a vehicle is not a but-for cause of the discovery of evidence in the vehicle. The simplest statement of the concept of but-for causation is that event A is a but-for cause of event B if event B could not happen without event A happening first. But-for causation is an inference drawn from regularly observed correlation.

But it must be stressed that causation is an inference, not an observation, as philosophers since at least Hume have reminded us. The only empirical facts that we can discover about the world are facts about correlation. We cannot observe causal relationships, whether of cue ball to eight ball, of moon to tides, or of diet-pill ingestion to heart failure. What we observe is correlation, and when we see it regularly enough, we hypothesize causation. Science progresses by repeated testing and attempted invalidation of causal hypotheses. Those that survive the process persist.

The relationship between the seizure of a passenger in a moving vehicle, which necessarily occurs when that vehicle is stopped by the police, and the subsequent discovery of evidence during that stop, is one of ineluctable and undeniable correlation. The day has not dawned when a police officer can effectuate a traffic stop without seizing all the occupants of the

39

vehicle.[23]   The correlation between that seizure and the discovery of evidence during the stop is a perfect 100 percent. As an empirical matter, therefore, the facts on the ground meet the definition of but-for causation:   you never see the one without seeing the other first.

So should we hypothesize – or, given our institutional position, perhaps "impose" is the better term – a causal relationship between the seizure and the discovery of the evidence?  As detailed above, the dominant view in the circuits is that the causal nexus between the traffic stop and the discovery of evidence is self-evidently sufficient to support suppression.

We agree that the causal relationship seems close, and clear.  But we will not pretend that we have no role in imposing, as a legal matter, that causal relationship onto the fact pattern before us, or that such judgments can be made with iron-clad logical or empirical precision.  We do not ignore the fact that the analytic separation of individual constitutional violations is a plausible logical deduction from the proposition that Fourth

---

[23]Of course, the day may dawn – perhaps it already has – when police may search the interior of a moving car without stopping it or in any way restricting the freedom of movement of the occupants, for example by employing remote electronic devices.  In such a situation, where no seizure of the car's occupants is effected, *Rakas* would control and passengers would lack the right to suppress evidence discovered.

40

Amendment rights are personal. We do, however, reject such separation.

We think the better view is that a traffic stop is a single act, which affects equally all occupants of a vehicle. To us, that description of traffic stops comports with the commonsense experience of everyone who has ever ridden in a car; we agree with the First Circuit that the distinction between passenger and driver "is a distinction of no consequence in this context." *Kimball*, 25 F.3d at 5. A police officer who pulls over a vehicle does not, in the act of pulling over the vehicle, interact separately with each occupant; rather, the officer undertakes one action – turning on the siren and lights – which instantly affects everyone in the targeted vehicle, signaling to them that their freedom of movement has been restricted. It defies common sense and common experience to transmute one action into three, and we will not endorse a Fourth Amendment approach that relies on such a transmutation. The government insists that "Fourth Amendment rights are personal rights," and we do not contest the abstract validity of that proposition. But general propositions do not decide concrete cases, and we reject the practical implications the government seeks to derive from that proposition. We reject "blind adherence to a phrase which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth Amendment." *Rakas v. Illinois*, 439 U.S. 128, 147 (1978).

Furthermore, the relationship between a traffic stop and the discovery of evidence during that stop is not like the relationship between two balls on a billiard table. Law is not

41

physics. In even its most aspirationally scientific manifestations, the law recognizes and embraces the infusion of a multiplicity of values into judicial determinations of causal relationships, *see*, *e.g.*, Carl F. Cranor & David A. Eastman, *Scientific Ignorance and Reliable Patterns of Evidence in Toxic Tort Causation*, 64 L. & Contemp. Prob. 5 (2001) (assessing the extent to which courts are willing or able to assimilate and evaluate scientific models of causation in complex cases), and the Supreme Court has done so even more emphatically, and recently, in the context of the exclusionary rule. Fourth Amendment rules cannot be derived from deductive reasoning from first principles, nor do they crystallize, unaided, from the naked facts of disputed searches.

The Supreme Court has just this Term reiterated that the exclusionary rule was founded on, and is grounded in, the continuing exercise of pragmatic judicial supervision of the law enforcement activities of the executive branch, effectuated by expansion and contraction of the bubble of proximate cause as courts face particular concrete factual situations. *See Hudson v. Michigan*, 547 U.S. --- (2006) (eliminating suppression remedy for knock-and-announce violations because, inter alia, as compared with the 1950s, police departments are more likely to be "staffed with professionals," and lawyers are more likely to take on § 1983 cases). The test by which our models of constitutional causation are measured is not empirical validation by experiment, but rather the march of social progress, refracted through continual judicial evaluation of constitutional purposes and social consequences. As the social context of law enforcement evolves, so too does the exclusionary rule. The debate about the constitutional consequences of traffic stops is

42

akin, in this respect, to the debate about the constitutional consequences of electronic surveillance or computer copying. *See*, *e.g.*, Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 561 (2005) (pondering whether electronic copying of computer files constitutes a "seizure," and if so what the appropriate Fourth Amendment remedy should be).

The Supreme Court stressed in *Hudson* that in determining whether a particular Fourth Amendment violation is causally related to a particular challenged piece of evidence in such a way as to trigger the exclusionary rule, we must look not only to the logical relationship between the violation and the discovery of the evidence, but also to the nature of the personal and social interests the Constitution protects, the prevalence of the illegal police practice at issue, the deterrent value of the suppression remedy, and the likely practical effects of a particular rule. *See Hudson*, slip op. at 8-13 (determining constitutional suppression requirements based on evolving social realities).

Applying these tests, we find that the purposes of the Fourth Amendment are best served by extending the bubble of proximate causation to vehicle passengers. Passengers, no less than drivers, have a constitutional interest in protection from unreasonable seizures. Two of the more constitutionally troubling varieties of unreasonable seizures, both implicated in this case, are those that occur when police stop vehicles based on anonymous tips, or based on the race of the vehicle's occupants. While the Supreme Court may be right about the increased professionalism of police and the robustness of the

43

§ 1983 plaintiffs' bar, we cannot say that either racial profiling or reliance on anonymous tips has declined in frequency in recent years, or that civil lawsuits will adequately deter such practices. Nor can we say that the various other categories of cases that give rise to passenger suppression motions are rare, decreasing, sufficiently internally disciplined, or otherwise deterred. Furthermore, Americans spend more time in cars with each passing year, *see*, *e.g.*, Dep't of Transportation, *2001 National Household Travel Survey*, *available at* http://www.fhwa.dot.gov/policy/ohpi/nhts (reporting "dramatic increases" in time spent driving between 1969 and 2000), and as the circuit cases described above demonstrate, the use of traffic stops as investigatory tools is a widespread and standard police practice.[24]

---

[24]That this practice is legitimate is at present beyond constitutional cavil under *Whren*. However, the excesses its use periodically engenders have not gone unnoticed, and in recent years many police departments have studied and adopted procedural reforms that may be implemented to monitor vehicle stops and reduce the incidence of racial profiling and other abuses of the seizure power on the roads. *See*, *e.g.*, Robin Shepard Engel, et al., *Project on Police-Citizen Contacts* (2004) (report and recommendations prepared for Pennsylvania State Police Commissioner Colonel Jeffrey Miller); New Jersey Senate Judiciary Committee, *The New Jersey Senate Judiciary Committee's Investigation of Racial Profiling and the New Jersey State Police: Overview and Recommendations* (2001) (recommendations for reforms in wake of widely-publicized racial profiling incidents). Such reforms can provide significant

Furthermore, were we to allow the government to use against Mosley the evidence recovered in this case, we would weaken, indeed nearly eviscerate, the Supreme Court's clear and unanimous command in *Florida v. J.L.* that an anonymous tip is a constitutionally deficient basis for an investigatory detention. *See* 529 U.S. at 273-74. The Supreme Court did not, we presume, contemplate that its plain constitutional holding could be simply ignored as to all occupants of a vehicle other than the driver, and we will not lightly countenance such a result.

Nor, finally, is the reductio ad absurdum presented above (stationary mobile home versus moving mobile home) really all that absurd. The level of justification required to support a valid car search is extremely low, as we explained above, as compared with that required to support a valid home search. Most obviously, in contradistinction to house searches, there is no general warrant requirement for car searches. *See*, *e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). Thus all occupants of cars, drivers and passengers alike, are

protection for equal protection and due process rights, in addition to Fourth Amendment rights, and we recognize that the incentives created by the exclusionary rule have a significant effect on police behavior. Allowing unfettered use against passengers of evidence obtained during unconstitutional traffic stops could undermine these reform efforts. And unlike the knock-and-announce rule, the constitutional prohibitions on racial profiling and reliance on anonymous tips do go the heart of the validity of the underlying police action itself, not merely the method of its execution.

overwhelmingly more likely to be subject to police scrutiny when on the road than when at home. Of course, illegal police entries into and searches of homes do occur. But the frequency with which police effect forcible entries into homes is incomparably less than the frequency with which they pull over cars, and the teaching of *Hudson* is that such social facts matter. If warrantless house searches were as common as roadside traffic-stop searches, for example, then perhaps the protection afforded houseguests in *Minnesota v. Olson*, 495 U.S. 91 (1990), might have been broader. The exclusionary rule expresses, inherently and always, a standard of reasonableness that evolves along with police practices and social norms.

The exclusionary rule is a judge-made remedy designed to deter illegal police conduct. The *Hudson* decision has made it clear, if there was ever any doubt, that decisions about both the application of the rule are pragmatic decisions requiring practical wisdom rather than syllogisms. Justice Scalia's opinion epitomizes such pragmatic balancing, "interpreting the Constitution in light of its own practical concern for an active liberty that is itself a practical process," Stephen Breyer, *Active Liberty* 74 (2005). It is in that spirit that we decide this case.

## IV.

The car in which Mosley was riding was pulled over illegally. Mosley was illegally seized the moment the car was pulled over. The stopping of the vehicle was a but-for cause of the discovery of the guns. The bubble of causation which links a traffic stop to a subsequent search extends to all occupants of the stopped vehicle. To overcome Mosley's suppression

46

motion, therefore, the government would have had to establish one of the traditional exceptions to the *Wong Sun* rule: attenuation, inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal stop. The government raised no such exception at trial, and raises none on appeal. We therefore hold that the guns were fruit of the poisonous tree and must be suppressed.

Accordingly, we will vacate Mosley's conviction, and remand the case to the District Court for further proceedings consistent with this opinion.