**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**FRANCISCO PEREZ POLANCO, and DOMIQUITE MATHURIN,**
**Defendants**

Criminal No. 2006-39

District Court of the Virgin Islands

Division of St. Thomas and St. John

January 25, 2007

DELIA SMITH, AUSA., *For the Plaintiff.*

THURSTON MCKELVIN, FPD., *For Domiquite Mathurin, Defendant.*

LEONARD BERNARD FRANCIS, ESQ., *For Francisco Perez Polanco, Defendant.*

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(January 25, 2007)

Before the Court are the suppression motions of Francisco Perez Polanco ("Polanco") and Domiquite Mathurin ("Mathurin") (collectively, the "defendants"). Polanco seeks suppression of all evidence seized during the search of the vehicle in which he was a passenger on June 15, 2006. Mathurin seeks to suppress all physical evidence seized during a search of the vehicle in which he was a passenger on June 15, 2006, as well as any evidence seized from his person during a search that occurred after he was arrested. Mathurin also moves to suppress all statements he made while he was in custody. A suppression hearing was held in this matter on November 2, 2006.

## I. FACTS

At approximately 11:00 a.m. on June 15, 2006, the Drug Enforcement Administration (the "DEA") received a call from Immigration and Customs Enforcement ("ICE") agents, indicating that a suspicious vessel was en route from Culebra, Puerto Rico to St. Thomas, U.S. Virgin Islands. ICE described the vessel as blue in color and low to the water line. ICE also indicated that the vessel had two outboard engines and no apparent recreational equipment on board. Approximately twenty minutes later, DEA Special Agent Michael Aguilar and High Intensity Drug Trafficking Area ("HIDTA") Task Force Agent Shawn Querrard observed the vessel at Crown Bay Marina ("Crown Bay"). The agents conducted surveillance on the vessel for approximately ten minutes.

Customs and Border Protection inspector Richard Peak interviewed Crown Bay personnel regarding the vessel and learned that an individual by the name of Francisco Perez had checked in to the dock space on the morning of June 15, 2006, and planned to check out at midnight that night. The DEA agents showed a photograph of Polanco to Crown Bay personnel, who identified him as the individual who had rented the dock space. Crown Bay personnel also indicated that Polanco had no luggage, and that he had requested a taxi to the nearest hotel.

After contacting several hotels in the area, Agent Aguilar learned that Polanco had checked into the Island Beachcomber Hotel (the "Beachcomber") on June 15, 2006. The agents discovered that he was staying in Room 207, and was scheduled to check out the next day, on June 16, 2006. A criminal records check of Polanco indicated that he had been arrested in Puerto Rico with approximately six kilograms of cocaine on April 26, 2004. He had also been detained in Puerto Rico with approximately $260,000 in cash on September 18, 2004.

At around noon on June 15, 2006, the agents set up surveillance at the Beachcomber. Several agents participated in the surveillance throughout the day. At approximately 7:30 p.m., the agents saw a green Toyota 4-Runner (the "4-Runner") enter the Beachcomber parking lot. The agents observed a driver in the 4-Runner, later identified as Dioniso Mercedes ("Mercedes"), as well as one passenger, later identified as Mathurin. Mathurin exited the vehicle carrying a light-colored plastic bag and entered Room 207. A few minutes later, Mathurin left the room without the bag and drove away in the 4-Runner driven by Mercedes.

Approximately two hours later, Mathurin and Mercedes returned to the Beachcomber in the green Toyota 4-Runner. Mathurin entered Room 207 with a dark-colored bag. He left approximately one to two minutes later without the bag. A few minutes later, the agents saw Polanco exit Room 207 with a small tan colored backpack. As he left the room, Polanco stopped to looked [sic] around. He then followed Mathurin, but walked some distance behind him. Agent Aguilar testified at the suppression hearing that he found the manner in which the defendants exited the hotel room to be suspicious, stating that it "defied common-sense." (Suppression Hr'g Tr. 15, November 1, 2006) (hereinafter "Hr'g Tr."). Both Polanco and Mathurin entered the 4-Runner, which exited the parking lot and drove toward Crown Bay.

Moments later, the agents stopped the vehicle and ordered the occupants to get out. Polanco, who had been sitting in the rear passenger seat, exited the vehicle and immediately fled on foot towards the Best Western Emerald Beach Hotel and into the bushes. The agents apprehended and arrested Polanco outside the vehicle. Mathurin and Mercedes were also arrested. A search of the vehicle uncovered a small tan backpack on the back seat, which appeared to be the same backpack the agents had seen Polanco carrying as he left the hotel room. Inside the backpack, the agents found 2.2 kilograms of a substance that later tested positive for cocaine.

On July 6, 2006, a grand jury returned a two-count indictment against the defendants. Count I alleges that Polanco and Mathurin, while aiding and abetting each other, knowingly and intentionally possessed with the intent to distribute 2.2 kilograms of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II narcotic controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 841(a)(1), and (b)(1)(B)(iii). Counts II and III allege that Polanco and Mathurin, respectively, knowingly and intentionally used communication facilities (cellular phones) in committing, causing, or facilitating the commission of possession with intent to distribute a Schedule II narcotic substance (cocaine) in violation of 21 U.S.C. §§ 843(b) and (d)(1).

In his motion to suppress, Polanco contends that the agents violated his Fourth Amendment rights by stopping the 4-Runner without reasonable suspicion. He seeks suppression of all evidence seized as a result of the stop.

Mathurin argues that the agents violated his Fourth Amendment rights by conducting a "search, seizure and/or arrest" without probable cause or any other legal justification. He seeks to suppress all evidence seized and statements made as a result.[1] Mathurin does not, however, allege any violation of his *Miranda* rights or any defect in his waiver thereof.

## II. DISCUSSION

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. CONST., amend. IV.[2] "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985). There is a presumptive requirement that searches or seizures be carried out pursuant to a warrant. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well—delineated exceptions.") (internal citations omitted).

██ In some instances, warrantless searches or seizures will be considered reasonable if based on probable cause. *See Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. ..."). For example, police may search a vehicle without a warrant if they have probable cause to do so. *Ornelas v. United States*, 517 U.S. 690, 693, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). The rationale behind this automobile exception to the warrant requirement is that "the 'ready mobility' of automobiles permits their search based only on probable cause." *United States v. Burton*, 288 F.3d 91, 100-101 (3d Cir. 2002).

██ The police may also lawfully arrest a suspect without a warrant if the officer has probable cause to believe the suspect has committed a felony and the arrest does not occur in the suspect's home. *See United*

---

[1]   Mathurin's motion to suppress clearly seeks suppression of incriminating statements obtained as a result of the alleged illegality. However, no testimony was presented at the suppression hearing regarding the content of those statements.

[2]   The Fourth Amendment has been extended to the United States Virgin Islands by section 3 of the Revised Organic Act of 1954, 48 U.S.C. § 1561, entitled "Bill of Rights."

*States v. Watson*, 423 U.S. 411, 418, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976) ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant ... for a felony not committed in his presence if there was reasonable ground for making the arrest."); *see also Maryland v. Pringle*, 540 U.S. 366, 373-74, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (upholding a warrant-less arrest where the police had probable cause to believe the defendant had committed a felony after they found cocaine within his reach).

> [A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest.

*Gerstein v. Pugh*, 420 U.S. 103, 113-14, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).

■ Furthermore, even without probable cause, the police may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Similarly, the police may stop a moving vehicle to investigate a reasonable and articulable suspicion that its occupants were involved in criminal activity. *Ornelas*, 517 U.S. at 693; *United States v. Hensley*, 469 U.S. 221, 226-27, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985).

■ Probable cause exists where the totality of the circumstances known to the agents at the time supported a fair probability that the suspect had committed or was committing a crime. *See Ornelas*, 517 U.S. at 696; *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). Whether probable cause exists is an objective inquiry. *See Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

■ Reasonable suspicion has been characterized as "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas*, 517 U.S. at 695 (quotations omitted). Courts must

look to the totality of the circumstances of each case to determine whether officers have a particularized, objective basis for suspecting that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273-74, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (internal citations omitted). Law enforcement officers may use their own training and experience "to make inferences ... and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* The standard of reasonable suspicion may not be satisfied by an officer's hunch alone. *Id. at 274.* The likelihood of criminal activity required for reasonable suspicion is lower than that required for probable cause. *Id.* Additionally, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Id.* at 277.

Finally, police officers may use their own training and experience as well as the observations of other officers in concluding whether reasonable suspicion or probable cause exists. *Arvizu*, 534 U.S. at 277; *Hensley*, 469 U.S. at 232.

### III. ANALYSIS

Polanco and Mathurin were passengers in the same vehicle when they were stopped. However, they were arrested separately, in different places. Accordingly, the legality of the stop will be addressed as it pertains to Polanco and Mathurin collectively, but the events that follow will be analyzed separately with respect to each defendant.

### A. The Stop of the 4-Runner

To make an investigatory stop, the agents needed reasonable suspicion that criminal activity was afoot. *Ornelas*, 517 U.S. at 693 (citing *Terry*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889); *see also Arvizu*, 534 U.S. at 274 (explaining that the degree of certainty required to establish reasonable suspicion is less than that required for probable cause). Thus, the totality of the circumstances must have supported a particularized and objective basis for the agents' suspicion that at least one of the 4-Runner's occupants was involved in criminal activity. *See Arvizu*, 534 U.S. at 274.

The government points to the following facts as the basis for reasonable suspicion that Polanco was engaged in drug trafficking. The St. Thomas DEA received a tip from ICE in Puerto Rico that a suspicious vessel, low to the water line, likely painted blue, with two outboard

751

engines, no appearance of recreational use, and a single occupant was headed for St. Thomas. Approximately twenty minutes after receiving the tip, the DEA saw a vessel matching ICE'S description at Crown Bay, in St. Thomas. The agents then gathered information about the driver of the vessel and identified him as Polanco, who they learned had previously been arrested with large amounts of cocaine and cash. They discovered that Polanco had paid for a slip at Crown Bay until midnight of that same day, and had secured a hotel room for one night only. Ten hours of surveillance revealed that Mathurin visited the hotel room twice. Both times he came with a plastic bag and left empty-handed. Polanco followed Mathurin out after his second visit, but walked a distance behind him. Then the two men drove away in the 4-Runner. Based on the above facts, together with reasonable inferences based on their training and experience,[3] the agents became suspicious that Polanco was engaging in drug trafficking activity in St. Thomas.

■ The totality of these circumstances gave the agents reasonable suspicion that Polanco was involved in drug trafficking activity. *See, e.g., United States v. Perez*, 440 F.3d 363, 371-72 (6th Cir. 2006) (finding reasonable suspicion where agents received a tip from another DEA office about a suspicious vehicle, the occupants procured a motel for one to two nights, rendezvoused with an unidentified female, loaded bags from the room to the vehicle, then to a parked vehicle, and then drove away); *see also United States v. Sharpe*, 470 U.S. 675, 682 n.3, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (finding reasonable suspicion based on an officer's observation that a truck had a camper shell similar to those often used to transport drugs that was driving with a car and evading police). Accordingly, the agents could properly stop the 4-Runner to confirm or dispel their suspicion that Polanco was engaged in criminal activity. *Ornelas*, 517 U.S. at 693.

Because there was objectively reasonable suspicion to stop Polanco, the initial stop of Mathurin was also lawful. *See, e.g., Maryland v. Wilson*, 519 U.S. 408, 414, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)

---

[3] Agent Aguilar testified at the suppression hearing that, "based on [his] experience here in St. Thomas ... small wooden ... boats like this type had been used in the past to smuggle drugs [and] currency between the islands." (Tr. Hr'g at 20.) He also testified that "what defied common sense [was] these two individuals did not exit the hotel room together, they did not walk to the vehicle together. They were separated by space." *Id.* at 14.

(holding that officers could not only stop passengers but order them out of the vehicle during a lawful stop without violating their Fourth Amendment rights).

## B. The Arrests and Searches

The initial stop was a single action requiring only one justification, though it restricted the liberty of both Mathurin and Polanco simultaneously. However, the agents needed individual probable cause to arrest each defendant. That is, each arrest must have been distinctly justified. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979) (holding that probable cause to search a tavern and its owner did not constitute probable cause to search or seize the tavern's customers); *see also Florida v. Royer*, 460 U.S. 491, 502-03, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) (holding that the extension of a detention beyond an investigatory *Terry* stop to an arrest must be supported by probable cause).

Both Polanco and Mathurin contend that the totality of the circumstances known to the agents at the time of their arrests did not support a fair probability that they had committed or were in the process of committing a crime.

### 1. Polanco

After the agents stopped the vehicle, Polanco exited through the back door and fled on foot, leaving the tan backpack on the back seat. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Accordingly,

> [a suspect's] deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.

*Sibron v. New York*, 392 U.S. 40, 66, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). Indeed, a suspect's unprovoked flight during a lawful *Terry* stop may form part of the basis for probable cause to extend the scope of a stop to an arrest. *Id.*

At the suppression hearing, Agent Aguilar testified as to the facts and circumstances that formed the basis for Polanco's arrest:

> THE WITNESS: The basis for [Polanco's] arrest was ... the information from ICE that a suspicious vessel had arrived in St. Thomas with a single occupant, no fishing gear, or recreational purpose, the interviews with Crown Bay marina stating that the individuals due to checkout at midnight that night and did not appear to have any luggage, that he requested the nearest hotel, not request any-specific hotel, the interviews with the hotel, that he paid cash for his hotel room, and he was due to checkout that next day; the criminal history information that Mr. Perez Polanco had been arrested and detained before with approximately 6 kilograms of cocaine and over $260,000 in U.S. currency and arrest for aggravated assault; and the observations of Mr. Perez Polanco staying in his [ ] hotel room, Mr. Mathurin arriving on two occasions, visiting the hotel room for a short time period, delivering bags into the hotel room, exiting without bags and then Mr. Perez Polanco exiting the hotel room with a knapsack and with Mr. Mathurin in the same vehicle.

(Hr'g Tr. 29-30.)

The Court agrees that the facts and circumstances known to the agents at the time of Polanco's arrest, together with the agents' reasonable inferences based thereon, supported a fair probability that Polanco was engaged in drug trafficking activity. Thus, the agents had probable cause to arrest Polanco.

After lawfully arresting a suspect, the police may conduct a warrantless search incident to the arrest. *New York v. Belton*, 453 U.S. 454, 461, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (holding that the search of a jacket on the floor of a car was valid as incident to a lawful arrest). The scope of such a search generally extends to the arrestee's person as well as areas within his immediate control. *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1979) (construing the term "immediate control" to mean "the area from which [the arrestee] might gain possession of a weapon or destructible evidence.").

The "immediate control doctrine" permits a warrantless search of the entire passenger compartment of a vehicle and any containers within it pursuant to the lawful arrest of either a person in the vehicle or a "recent

occupant" of the vehicle. *Thornton v. United States*, 541 U.S. 615, 622-23, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004). "[S]tatus as a 'recent occupant' of a vehicle may turn on an arrestee's temporal or spatial relationship to the vehicle at the time of the arrest and search." *Thornton*, 541 U.S. at 622. Recent occupant status is not, however, affected by whether the arrestee was inside or outside of the vehicle when police first initiated contact with him. *Id.*

■ Here, the agents lawfully arrested Polanco outside of the vehicle, as he attempted to run away from them. Before the agents left the scene of the arrest, they searched the vehicle and discovered the cocaine. Because Polanco was a recent occupant of the vehicle, the searches of the 4-Runner and backpack were validly conducted incident to the lawful arrest of Polanco. *See, e.g., United States v. Wesley*, 352 U.S. App. D.C. 264, 293 F.3d 541, 549 (D.C. Cir. 2002) (holding that the search of a car ashtray was valid pursuant to a lawful arrest, even though the defendant had been handcuffed and placed in a police car).

Accordingly, the search of the 4-Runner and the backpack found therein did not violate Polanco's Fourth Amendment rights. The Court will not suppress the evidence found in the 4-Runner.

### 2. Mathurin

Mathurin seeks to suppress the cocaine found in the 4-Runner in which he was a passenger and the statements he later made to the DEA agents as the fruit of his illegal arrest. *See Wong-Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1969) (extending the exclusionary rule to the indirect products, or fruits, of a Fourth Amendment violation). Though the Court has already determined that the initial stop was lawful, the Court must decide whether the agents had probable cause, at the time, to arrest Mathurin. If not, then the Court must decide whether the cocaine or statements should be suppressed as the fruit of the illegal arrest.

### i.  Probable Cause to Arrest Mathurin

At the suppression hearing, the Court asked Agent Aguilar what facts and circumstances known to the agents at the time of Mathurin's arrest supported probable cause to believe that he was involved in a drug transaction.

THE WITNESS: It would be his—yes, his association, interaction with Mr. Perez Polanco.

THE COURT: That's it?

THE WITNESS: And his, his actions and his association would be the two main things.

THE COURT: But his actions in this case were what?

THE WITNESS: Arriving at the hotel room at approximately 7:30, the first time with the light plastic bag, and left without that bag.

THE COURT: So it was his visits to Mr. Perez basically, Perez Polanco.

THE WITNESS: Correct.

THE COURT: Anything else other than his visits to Mr. Perez Polanco?

THE WITNESS: No.

(Hr'g Tr. 23-24.)

However, "mere association and consorting with drug traffickers does not give rise to probable cause in and of itself." *United States v. Harris*, 482 F.2d 1115, 1118 (3d Cir. 1973). Because the government had presented no evidence that Mathurin was engaged in criminal activity other than his two visits with Polanco, it has failed to establish that the agents had probable cause to arrest Mathurin.

### ii. Fruit of the Poisonous Tree

The fact that Mathurin was unlawfully arrested does not automatically render the cocaine found and statements obtained thereafter inadmissible. Rather, the admissibility of evidence obtained after an illegal search or seizure depends on whether the defendant has standing to object to the primary illegality and whether the proffered evidence was obtained through exploitation of the primary illegality. *Wong-Sun*, 371 U.S. at 487-88, 492. Here, Mathurin clearly has standing to object to his arrest as an unlawful seizure of his person.[4] The issue is whether the agents

---

[4] The government argues that Mathurin may not challenge the legality of the search because he had no ownership or possessory interest in the 4-Runner or the backpack. It is

exploited Mathurin's illegal arrest to obtain the evidence. That is, the Court must ask whether there was a causal connection between Mathurin's arrest and the subsequent discovery of the evidence. *See Brown v. Illinois*, 422 U.S. 590, 601-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (construing the issue of whether the police exploited a prior Fourth Amendment violation as whether the evidence found thereafter was causally connected to the primary illegality).

In cases where the causal connection is not inherent, Courts ask whether the primary illegality was the "but for" cause of the discovery of the evidence. *See, e.g., United States v. Mosley*, 454 F.3d 249, 253-259 (3d Cir. 2006) (holding that an illegal traffic stop was the but for cause of the discovery of a gun in the vehicle); *United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001) (holding that the illegal detention of the defendant—passenger in the front seat with the driver was not the but for cause of the discovery of narcotics in the trunk).

Some Courts hold that the illegal detention of a passenger (with no ownership or possessory interest in the car) after a lawful traffic stop cannot be the "but for" cause of the discovery of evidence in the car because the passenger's personal right not to be seized is separate from the reasonable expectation of privacy that is violated when a car is searched illegally. *See Deluca*, 269 F.3d at 1132; see also United States v. Carter, 14 F.3d 1150, 1154 (6th Cir. 1994) ("Suppose that at the time of the driver's arrest the police had summoned a taxi cab for [the defendant passenger] and told him he was free to leave. The marijuana would still have been discovered, because it was located in a van owned and controlled by [the driver] (who was not going anywhere until his

---

true that "Fourth Amendment rights are personal rights, and a search of a car does not implicate the rights of non-owner passengers. ..." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006). However, this case involves more than just an automobile search—it involves two separate seizures of Mathurin: the stop and the subsequent arrest.

Thus, while Mathurin may have lacked a reasonable expectation of privacy in the items searched and while his initial stop was lawful, he may still challenge the legality of his later arrest. *See Royer*, 460 U.S. at 502-03 (holding that, despite the lawfulness of the initial stop, the police violated the defendant's Fourth Amendment rights by exceeding the limits of a Terry stop without probable cause to do so); *Mosley*, 454 F.3d at 253 (holding that passengers in a vehicle who have been illegally seized have standing to object to the illegal seizure, even if they may not object to the search of the vehicle itself).

vehicle had been searched) and not in a vehicle controlled by [the defendant passenger].").

The Third Circuit, however, has adopted a practical approach to "but for" causation. *See Mosley*, 454 F.3d at 260, 269 (holding that, in cases where the initial stop is illegal, "[t]he bubble of causation which links a traffic stop to a subsequent search extends to all occupants of the stopped vehicle"). Though the holding in *Mosley* does not apply to the facts of this case, the rationale behind the decision does.

*Mosely* defined "but for" causation as "an inference drawn from regularly observed correlation." *Id.* at 266. In other words, "event A is a but—for cause of event B if event B could not happen without event A happening first." *Id.* Applying this standard, the Third Circuit explained that because an officer undertakes one action in stopping a vehicle, it "defies common sense and common experience" to transmute one action into many by analytically separating the Fourth Amendment violations with respect to each individual occupant of the vehicle. *Id.*

■ Under this pragmatic approach to "but for" causation, the Court must determine whether Mathurin's illegal arrest was the "but for" cause of the discovery of the cocaine in the 4-Runner or the statements Mathurin made to the DEA agents. Unlike the illegal stop in *Mosley*, the stop here was lawful, so no violation of Mathurin's Fourth Amendment rights necessarily preceded the search of the car. There was no necessary correlation between Mathurin's unlawful arrest and the subsequent discovery of the cocaine in the 4-Runner. Mathurin's arrest was separate and distinct from Polanco's arrest and from the conclusion that probable cause existed to search the backpack. Therefore, Mathurin's illegal arrest was not the "but for" cause of the discovery of the cocaine. Accordingly, the cocaine will not be suppressed as the product of Mathurin's illegal arrest.

■ However, there is a necessary correlation between Mathurin's statements and his arrest. Suspects are regularly observed making incriminating statements after being arrested by police. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (finding sufficient coercion inherent in custodial interrogation by law enforcement officers to warrant mandatory procedural safeguards). Indeed, it seems highly unlikely that the agents could have obtained any incriminating statements from Mathurin without arresting him first.

Therefore, Mathurin's illegal arrest was the "but for" cause of the agents' acquisition of the statements.

Furthermore, the government has not established that any of the exceptions to the fruit of the poisonous tree doctrine (attenuation, inevitable discovery, independent source, or intervening circumstance) purged the taint of the illegal stop. *See Mosley*, 454 F.3d at 269 (granting the defendant's motion to suppress where the government had not shown that any exceptions to the fruit of the poisonous tree doctrine existed). The Court will therefore suppress the statements made by Mathurin after his arrest on June 15, 2006.

## III. CONCLUSION

For the reasons set forth above, the Court will deny Polanco's motion to suppress. With respect to Mathurin, the Court will deny the motion to suppress as it relates to the cocaine, but grant the motion as it relates to the statements Mathurin made after his illegal arrest. An appropriate judgment follows.