## UNITED STATES of America

v.

## Michael HESTER, Defendant.

## Crim. No. 15–296 (KM)

United States District Court,
D. New Jersey.

Signed February 11, 2016

Bruce P. Keller, Sean M. Farrell, Office of the U.S. Attorney, Newark, NJ, for United States of America.

K. Anthony Thomas, Lisa Mack, Office of the Federal Public Defender, Newark, NJ, for Defendant.

**OPINION & ORDER (Suppression motion)**

KEVIN McNULTY, UNITED STATES DISTRICT JUDGE.

This one-count Indictment charges that the defendant, Michael Hester, having pre-

viously been convicted of a felony offense in the Superior Court of New Jersey, Essex County, illegally possessed a firearm and ammunition. See 18 U.S.C. § 922(g)(1). Mr. Hester filed a number of motions (ECF No. 24), many of which I have disposed of by order. I write separately, however, on his motion to suppress evidence—specifically, a gun seized from Mr. Hester on October 7, 2014.

Hester contends that the gun must be suppressed as the fruit of an illegal seizure because there was neither reasonable suspicion nor probable cause to stop or search him. The government responds that the police saw Hester drop the gun on the floor of a car in an attempt to conceal it, but that he had not been seized at the time.

## I. Request For Hearing

Mr. Hester's motion contains an unsworn, two-sentence statement of facts:

> On October 7, 2014, Mr. Hester, while sitting in the passenger seat, a police officer approached the passenger door and opened it. When Mr. Hester was ordered out of the car, this officer searched in car and recovered the firearm.

(ECF No. 24-1 at 4) He offers to submit these facts in the form of an affidavit if the Court requires it. (*Id.* at 4 n.1)

The prosecution suggested that the motion could be decided without a hearing. I have elsewhere addressed at some length the threshold showing that a defendant must make to obtain an evidentiary hearing on a motion to suppress. See, e.g., *United States v. Vasquez–Rodriguez*, 2015 WL 3939057, at \*3–\*4 (D.N.J. June 25, 2015); *United States v. Barr*, Crim. No.

14–592, slip op. at 2–5 (D.N.J. Oct. 30, 2015). Suffice it to say that I have not rigidly insisted on an affidavit. A defendant must, however, set forth a colorable claim for relief and point to a dispute of fact that is of consequence to the determination of the issue. See, e.g., *United States v. Hines*, 628 F.3d 101, 108 (3d Cir.2010); *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir.1996); *United States v. Jackson*, 363 Fed.Appx. 208, 210 (3d Cir. 2010). [1]

Defendant Hester's initial showing was certainly skimpy. I read it generously, however, as a contention that he was detained, without reasonable suspicion, at the moment he was "ordered" out of the car. The gun, he says, was a fruit of that prior wrongful seizure. The government denies that Hester was seized, or that that the police ordered him out of the car. That dispute of fact has potential legal consequences. Under *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), if a suspect has not yet been subjected to physical force and has not voluntarily submitted to authority (for example, if he is fleeing), he has not been "seized." Such a suspect's right to suppress evidence as the fruit of a seizure has not yet attached.

The government cites *Hodari D.* as one justification for denying suppression. That being the case, it seemed better to establish the facts, rather than to rule in the alternative based on competing versions of the facts. I therefore convened an evidentiary hearing on January 15, 2016. I also permitted the parties to submit post-hearing briefs.

---

1. That initial responsibility to identify a factual issue is a threshold burden. It does not detract from the government's ultimate burden of persuasion, in a proper case, that the evidence was constitutionally obtained. See

*United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

## II. Findings of Fact

### A. The hearing

At the suppression hearing, the government introduced the testimony of two witnesses: Detective Tauron Hinnant and Sergeant Joseph Conzentino. Det. Hinnant has 18 years' experience and has made some 400 gun arrests. Sgt. Conzentino has 28 years' experience and has made hundreds of gun arrests. The defendant introduced in evidence certain police photographs of the scene, but did not testify or call any witnesses. In post-hearing briefs, the defendant questioned the likelihood of the officers' account, especially in light of a DOJ investigation Finding that the Newark Police have engaged in unlawful policing. But the defendant himself introduced no evidence that contradicted the police account of the facts in this case. Counsel's general disparagement of the officers' credibility was insufficient to persuade me that the hypothetical opposite of the officers' account must be the true one.

Based on the testimony at the evidentiary hearing, I have made findings of fact, which I relate below in narrative form. My findings are based on the officers' testimony, which I found credible and consistent. Cross examination uncovered minor inconsistencies (whether one of the cars was marked or unmarked; whether the officers' inaccurate transcription of the license plate number of the Honda; whether it had rained). Defendant also sought to establish that the officers' stated reasons for questioning the occupants of the car were not their true, subjective reasons. This cross-examination did not detract significantly from the credibility of the officers' accounts of the facts.

### B. The court's factual findings

On October 7, 2014, Det. Hinnant was working the 7pm to 3am shift. He was riding in a marked police car with Officer Philips. Behind them, in an unmarked car, were two other officers, Lieut. Gialanella and Sgt. Conzentino.

Hinnant testified that the two cars were traveling north on 19th Street, approaching the corner of 15th Avenue. Hinnant and Conzentino, who patrol that territory regularly, know it as a high crime area. On the northeast corner of that intersection there is a store, currently known as "Jeffs Urban Clothing," although it has changed ownership multiple times. Hinnant has made drug arrests there, and search warrants for narcotics have been executed there. Normally, however, the police cannot easily gain access, because it has a buzzer system on the front door. Conzentino believes the store has beverages for sale. Photographs in evidence show the layout of the street corner, and the officers testified that it was well lit at night.

At about 11:40 pm, the officers saw a black Honda Accord parked on 19th Street by the corner store. It was illegally parked within 25 feet of a crosswalk. *See generally* N.J. Stat. Ann. § 39:4–138(e)(1). There was not a "No Parking" sign, however, and the curb was not marked in yellow. The Honda's engine was running but no one was in the driver's seat. A woman (later identified as Ms. Hiddayah Muse), came out of the corner store and entered the driver's side of the Honda. A second, male occupant of the car (later identified as Mr. Hester) sat in the front passenger seat. Hinnant testified credibly that two factors—the illegal parking and the woman's coming from Jeffs Urban Clothing—led the officers to investigate further.

The first car, containing Hinnant, pulled up next to the driver's side of the Honda. The second car, containing Conzentino, pulled up behind the Honda. There was sufficient room in front of the Honda to permit it pull away. The officers did not

put on any overhead flashing lights. All of the police officers got out of their cars. Hinnant walked to the driver's side window of the Honda. The other three officers approached the passenger side window. Their weapons were not drawn. The officers did not tell Muse and Hester that they were, or that they were not, free to leave.

Ms. Muse was now in the driver's seat of the Honda, and the engine was still running. Through the driver's side window, Hinnant asked Muse for her driver's license. Muse replied that the Honda was not her car, and that she did not have a license. Because she was not licensed to drive, Hinnant asked her to turn off the car and step out. She complied and walked toward the back of the Honda.

After Muse said that she had no license, Mr. Hester, from the passenger seat, said "We're good, officer. I can drive." After the hearing, Hester submitted evidence that he did not possess a valid license, either. (ECF No. 35–1) The officers did not then have time to check Hester's license, however, because of the events that quickly followed.

Mr. Hester started to rise from the passenger seat and get out of the car.[2] Gialanella was watching Hester closely, with particular attention to his hands, as is normal police procedure. Conzentino heard a thump, consistent with a gun being dropped to the floorboards of the car. At about the same time, Gialanella yelled the warning code for a weapon. Gialanella told Conzentino to remain with the gun.

Mr. Hester, now outside the car, began running. He ran south on 19th Street toward 15th Avenue (i.e., toward the rear of the Honda). Det. Hinnant estimated

that 4 or 5 seconds passed between Hester's volunteering to drive and his flight.

Hinnant grabbed Hester's shirt, slowing him, and with the assistance of Philips and Gialanella wrestled Hester to the ground. Hester resisted, but was ultimately handcuffed. While this was occurring, Conzentino, in response to Gialanella's order, remained behind by the passenger side of the Honda. The passenger-side door of the car remained open. Conzentino saw a black handgun on the passenger-side floor of the car, and he kept the gun in sight.

Because the crime scene unit was backed up with other calls, Conzentino took pictures. These depicted the parked Honda with the passenger-side door open. They also depicted a black semi-automatic pistol on the floor of the car. Cozentino testified credibly that nothing was moved before the pictures were taken.

The officers testified that Ms. Muse was given a parking ticket, although they were unable to produce it at the hearing. Muse was not searched or arrested. The car was not impounded, but left with Muse. Mr. Hester was arrested and taken to police headquarters. Sgt. Conzentino testified that the officers did not run a driver's license check on Hester at the police station.

## III. Analysis

### A. Introduction

The key legal dispute on this suppression motion is whether Mr. Hester himself was "seized" at the time he deposited the gun on the floor of the automobile. The key factual dispute is whether the officers "ordered" Hester out of the car. I resolve

---

**2.** Det. Hinnant, who was on the driver's side of the car, did not see Mr. Hester get out of the car, although he heard what Hester said and heard Lieut. Gialanella shout the code for a weapon. Sgt. Conzentino testified to what he saw from his vantage point on the passenger side.

both in the prosecution's favor, and deny Hester's motion to suppress the gun.

No one disputes that after the officers saw the gun, they had reasonable cause to seize Hester. At issue is whether his dropping of the gun while getting out of the car, and then fleeing, was the product of a prior illegal seizure of his person.

The seminal case defining a Fourth Amendment "seizure" of the person in the context of a motion to suppress physical evidence is *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). There, officers approached a group of juveniles, who scattered and ran. One officer, Pertoso, took a shortcut, emerged ahead of the fleeing Hodari, and ran toward him on a head-on collision course. As Pertoso approached, Hodari threw away a packet of drugs. The packet was recovered, and Hodari moved to suppress it. The California court held that Hodari was "seized" when he saw the officer running at him. The U.S. Supreme Court reversed.

Justice Scalia, writing for the Court, allowed that a "seizure" might result from even a slight application of physical force. 499 U.S. at 625, 111 S.Ct. 1547. At the time Hodari discarded the packet, however, there had been none. In the alternative, said the Court, a "show of authority" may effect a seizure—but only if there is "*submission* to the assertion of authority." *Id.* at 626, 111 S.Ct. 1547 (emphasis in original). Hodari was running, not submitting, when he discarded the drugs. They were therefore abandoned, not produced as the result of a "seizure" of his person. *See also United States v. Johnson,* 432 Fed.Appx. 118, 120 (3d Cir.2011) (citing *Hodari D.*) ("When property is voluntarily abandoned before a seizure and retrieved by the police, it has been lawfully recovered and there can be no claim that it was the subject of an unconstitutional seizure").

## B. No initial seizure of car and occupants

■ I first analyze this case, not as a "traffic stop," but as an ordinary street encounter.[3] When the officers walked to the car, there was no seizure of Mr. Hester. The Honda was stopped at the curb when the officers approached it. And because the officers did not stop the car, they did not stop the occupants, either. They simply approached the occupants, as they might approach a pedestrian, to ask them a few questions.

The usual test of a seizure under *Hodari D.* is whether the officers either applied physical force, or made a display of force to which the suspect submitted. *Williams,* 413 F.3d 347, considered that issue with respect to the occupants of a parked car. *Williams* reversed the trial court's suppression of evidence on the grounds that the police, approaching a parked van without reasonable suspicion, had "seized" its occupant. Not so, said the Third Circuit:

---

**3.** Below, I briefly consider the alternative contention that this was a traffic stop. See Section III.E, *infra.* The distinction between pulling over a moving car (which is a seizure of everyone in the vehicle) and an approach to a parked car (which is not necessarily a seizure of anybody) is illuminated by *Mosley,* 454 F.3d at 256–57 (distinguishing *United States v. Williams,* 413 F.3d 347 (3d Cir.2005) (parked car case)).

Hester stresses that the police referred to this as a traffic stop. That does not make it one. More fundamentally, the question is an objective, not a subjective one; the Fourth Amendment issue depends on "an objective assessment of the officer's actions in light of the facts and circumstances confronting [the officer) at the time and not on the officers actual state of mind at the time the challenged action was taken." *United States v. Johnson,* 63 F.3d 242, 246 (3d Cir.1995) (quoting *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985)).

[T]here was no seizure because there was no use of physical force, nor was there any show of authority when the police approached the van in their marked cruiser, exited their vehicle, and approached the parked van on foot. As the Supreme Court has noted, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places." *United States v. Drayton,* 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); see *also [Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)] ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."). The Fourth Amendment is simply not implicated by the police approaching the parked van, contrary to the District Court's ruling.

*Id.* at 352.[4] Where the police simply approach a parked, occupied vehicle and ask the occupant questions—much as they would approach a pedestrian—they need not have any preexisting reasonable suspicion or probable cause. *Drayton, supra* ; *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.") The encounter does not amount to seizure unless and until the police apply force or the suspect submits to their display of authority.

There was no such display of authority. As in *Williams,* the police approached, spoke, and asked questions. They did not display weapons (as the police in *Williams* did). (Defense counsel's brief exaggerated in stating that the police "surrounded" the vehicle; one police car was beside, and the other behind, the Honda.) The encounter did not at that point rise to the level of a seizure.[5]

## C. No seizure by virtue of "ordering" Hester out of the car

I arrive at the factual crux of Hester's motion: whether defendant Hester was "ordered" out of the car, and therefore seized. To persuade the court that the gun was the product of an illegal seizure, Hester must establish that he was *first* seized (i.e., the police ordered him to submit, and he complied), and *then* dropped the gun on the car floor. His flight on foot immediately thereafter, he contends, does not bear on the question of whether he had already been seized. There is a major factual difficulty with Hester's contention:

---

4. The Court also held in the alternative that, in the course of approaching the van, the officers developed reasonable suspicion in the form of green leafy substances and ziplock bags. The Court of Appeals specifically observed that there was no need for the district court to have reached the reasonable suspicion issue. *Id.*

5. Although no party raised the point, I consider whether the officers' request that Ms. Muse turn off the engine amounted to a seizure of Hester. Muse, although poised to drive the car, admitted she had no driver's license.

Telling her not to drive was an ordinary act of community policing, not a seizure of Hester, who was not then accused of unlicensed driving or anything else. For all that appears in this record, he remained free to depart on foot. Muse's unlicensed status was not a police-created situation, and denial of the opportunity to be chauffeured by an unlicensed driver is not a seizure of the person. *Cf Bostick, supra,* at 436, 111 S.Ct. 2382 (police questioning of bus passengers not necessarily a seizure, even if leaving would have caused them to miss the bus).

neither he, nor anyone else, backed up with testimony his counsel's contention that he was "ordered" out of the car. But I first consider the legal background.

*United States v. Waterman,* 569 F.3d 144 (3d Cir.2009), is in effect a real-life controlled experiment illustrating the issue of submission to authority under *Hodari D.* There, the government was forced to concede that if there had been a seizure, it would have been unlawful. The police lacked any reasonable suspicion when, with guns drawn, they approached five people on a porch and demanded that they put their hands in the air. Four submitted. The fifth, Waterman, did not; he tried to turn a door knob behind his back, and, when another person came out, he slipped into the house. The district court held that the four who obeyed the hands-up command had been seized, and suppressed contraband obtained as a result. But the Third Circuit held that Waterman, who did not submit to the command, had not been seized.

In so holding, the Court explored the issue of what a defendant must do to "manifest" submission (or not) to authority:

> Although *Hodari D.* involved a suspect engaged in headlong flight, we have since examined acts of defiance that are less overt. Our precedents suggest that "submission" under *Hodari D.* requires, at minimum, that a suspect manifest compliance with police orders. *See, e.g., Couden v. Duffy,* 446 F.3d 483 (3d Cir. 2006) (identifying as dispositive whether the suspect "manifests" a belief that he has not been seized (quoting *United States v. Smith,* 423 F.3d 25, 31 (1st Cir.2005))); *United States v. Hernandez,* 27 F.3d 1403, 1406–1407 (9th Cir.1994) (no "submission" to police authority when suspect, instructed by officer to "stop right there," pauses momentarily and makes eye contact with the officer

but flees thereafter); *see also United States v. Valentine,* 232 F.3d 350, 358–59 (3d Cir.2000) (citing *United States v. Johnson,* 212 F.3d 1313, 1315 (D.C.Cir. 2000)) (no submission to police authority when defendant disobeys police order to raise his hands); *United States v. Coggins,* 986 F.2d 651, 654 (3d Cir.1993) (suspect submits to police authority when he obeys officer's command to sit down). On the other hand, a "stop" is effected when police wear down an uncooperative suspect by making clear the need for compliance. *Johnson v. Campbell,* 332 F.3d 199, 206 (3d Cir.2003).

*Waterman,* 569 F.3d at 145–46 n. 3.

The government says that this case falls under *Hodari D.* and *Waterman.* Hester, they say, had not been seized when he dropped the gun. He had volunteered to drive, or alternatively was positioning himself to flee on foot, but either way he was not obeying any command by the police. He dropped the gun, apparently intending to conceal it. The officers, however, heard the gun drop and then immediately saw it. Mr. Hester, on the other hand, claims that he was "ordered" out of the car, and obeyed—a submission to authority under *Hodari D.* To his way of looking at things, he was illegally seized without reasonable suspicion at that moment, just before he dropped the gun.

■ I disagree with Mr. Hester—partly because I find factually that he was not "ordered" out of the car; partly because he did not get out in submission to authority; and partly because any "obedience"— momentary and probably feigned to facilitate flight—did not constitute submission to authority.

First, I am compelled to find that the officers did not "order" Mr. Hester out of the car. Although his motion papers say he was, no such evidence was produced at the hearing. Indeed, there is no evidence

that the officers ordered or even asked Mr. Hester to do anything.

Second, Mr. Hester points to no other command or exercise of authority that caused him to get out of the car. There is no evidence that he could not have remained precisely where he was, seated in the passenger's seat. True, the police told Ms. Muse, an unlicensed driver, to get out of the driver's seat. Mr. Hester then rose from his seat, but not in response to any command or display of authority. Rather, unprompted, he volunteered to drive in place of the unlicensed Ms. Muse.

Mr. Hester protests that the officers' account is absurd; he would not have volunteered to drive because his own license had been suspended.[6] The officers' account, however, is uncontradicted in the record. And it is not absurd; Hester might have hoped to bluff his way out of the entire situation and drive away. Or at least he might have hoped to bluff his way out of the car so he could run—which in fact is what he did.

Third, and in the alternative, I find that Hester's exit from the car—even if it had been in response to an order—would not have constituted a submission to authority, but a momentary feint. The plan was not to surrender, but to facilitate an exit, one way or the other. One of the cases that *Waterman* cited with approval, like this one, involved a momentary lulling pause in advance of flight. That, said the court, did not constitute submission to authority. *See Hernandez*, 27 F.3d at 1406–1407 (cited in passage quoted from *Waterman, supra*). *See also United States v. Smith*, 575 F.3d 308, 316 (3d Cir.2009) (officers question pedestrian and ask him to put his hands on the hood of the police car; pedes-

trian takes two steps toward the car, then runs); *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir.2000) (even accepting defendant's contention that he momentarily complied by giving his name in response to officers before fleeing, "he did not submit in any realistic sense to the officer's show of authority").

Mr. Hester was not ordered from the car, and did not submit to authority. Any acquiescence was at best a momentary diversion. Hester got out of the car (a) so that he (actually, or posing as, a licensed driver) could drive away; or (b) to position himself to flee on foot. Before dropping the gun and running away, Hester did not surrender or otherwise "manifest a belief" that he had been seized.

### D. Abandonment of the gun

■ Mr. Hester, no less than Hodari D., abandoned the evidence by dropping it where a government agent could see it. I have already rejected Mr. Hester's position that he dropped the gun as a result of a prior illegal seizure.

I accept the testimony that Mr. Hester dropped the gun on the floor of the car. He may have hoped that it would not be seen or that, if he fled successfully, he could deny any connection to it. At any rate, however, he got out of the car, leaving the door open, and the officers could see the gun.

Mr. Hester had no legitimate expectation of privacy in an area that others could see; he had no ownership or other interest in the car where the gun fell; and he had no claim of privacy as to the gun, which he abandoned. *See United States v. Fulani*, 368 F.3d 351, 354 (3d Cir.2004) (reasonable

---

**6.** I accept that contention arguendo. Defense counsel's questions on cross examination suggested that Hester's license was suspended, but no witness confirmed that. After the hearing, defense counsel filed a copy of a Depart-

ment of Motor Vehicles printout stating that Mr. Hester's license was suspended in 2008 based on the "Comprehensive Drug Reform Act," and was valid only as identification. (ECF No. 35-1)

expectation of privacy is forfeited when property is abandoned) (citing *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)); *United States v. Johnson,* 432 Fed.Appx. 118, 121 (3d Cir.2011) (finding that where no seizure had yet occurred during chase by police, voluntary decision to abandon handgun during flight was not fruit of the poisonous tree).

The defendant dropped the gun when he had not yet been seized for Fourth Amendment purposes. In all relevant respects, the dropped gun is like the dropped packet of drugs in *Hodari D.*

### E. Case analyzed as a traffic stop

█ Finally, and in the alternative, I analyze the case as a traffic stop. Although I do not believe it is appropriately viewed as such, both parties have devoted analysis to this approach, so I address it.

█ It is well settled that a moving automobile and its occupants are "seized" by virtue of being pulled over to the side of the road by the police. If that seizure is not supported by reasonable suspicion, evidence obtained as a result must generally be suppressed. *See United States v. Mosley,* 454 F.3d 249, 252–56 (3d Cir.2006) (surveying case law).

█ The government urges that if this had been a traffic stop, it would have been a permissible one. It was justified, they say, by the parking violation. Police officers may perform investigatory traffic stops based on reasonable suspicion that "an individual has violated the traffic laws." *United States v. Delfin–Colina,* 464 F.3d 392, 397 (3d Cir.2006). To be sure, the violation here was a minor one, but it is punishable by a fine and up to 15 days' imprisonment. *See* N.J. Stat. Ann. §§ 39:4–138(e)(1), 39:4–203. Similarly minor infractions have been held to justify a car stop. *See United States v. Richardson,* 504 Fed.Appx. 176, 179 (3d Cir.2012)

(reasonable suspicion justified pulling over car with defective rear center brake light, an infraction punishable only by a fine); *see also Arkansas v. Sullivan,* 532 U.S. 769, 771, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994 (2001) (speeding, improperly tinted windshield, punishable only by fine); *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) (failure to fasten seatbelts of driver and children); *Whren v. United States,* 517 U.S. 806, 817, 116 S.Ct. 1769, 1776, 135 L.Ed.2d 89 (1996) (waiting for over twenty seconds at a stop sign, turning without a signal, driving at an unreasonable speed). Although the officers could not produce the ticket they wrote, I was persuaded by their testimony that they did approach the car based on the parking violation.

That parking violation, I further find, occurred in conjunction with Ms. Muse's exit from a shady corner store late at night in a high-crime area. *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"). In short, the circumstances would have justified a brief investigative traffic stop.

█ During a traffic stop, police officers have the implied authority to control the vehicle and its occupants. *United States v. Bonner,* 363 F.3d 213, 217 (3d Cir.2004). An officer may require the driver, *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), or the passengers, *Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), to get out of the car. That permissible command is precisely what Hester complains of (but did not prove) here: that he was "ordered" out of the car.

Even viewed as a traffic stop, then, this was not an illegal "seizure" of the person.

The gun was therefore not the fruit of an illegal seizure. For all of the foregoing reasons, the defendant's motion to suppress evidence will be denied.

## ORDER

Defendant having moved to suppress evidence (ECF No. 24); and the United States having filed a response (ECF No. 25); and the defendant having submitted a reply (ECF No. 28); and the Court having held an evidentiary hearing and heard oral argument on January 15, 2015; and the parties having filed supplemental post-hearing briefs on February 5, 2016 (ECF Nos. 33, 34; *see also* supplemental exhibit, ECF No. 35–1); and the Court having engaged in fact finding and considered all of the submissions; and good cause appearing therefor;

IT IS this 11th day of February, 2016,

ORDERED that defendant's motion to suppress evidence is **DENIED,** for the reasons expressed in the foregoing opinion.